UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Donald Rhodes,
        Plaintiff

        v.                                    Case No. 16-cv-35-SM
                                              Opinion No. 2016 DNH 218
Holden Engineering & Surveying, Inc.;
Holden Engineering & Surveying, Inc. Incentive
Compensation Plan; and Peter Holden, as
Plan Administrator,
        Defendants


**O R D E R**


        Donald Rhodes was employed by Holden Engineering &

Surveying, Inc., from 1984 until 1995.  During four of those

years, he participated in Holden Engineering's "Incentive

Compensation Plan" – a deferred compensation plan administered

for the benefit of Holden's highly compensated employees.  This

litigation arises out of the Plan Administrator's refusal to pay

Plan benefits, in the amount of $60,000, to which Rhodes says he

is entitled under the plan.


        Pending before the court are the parties' cross motions for

judgment on the administrative record.  For the reasons

discussed, Rhodes' motion is granted in part and denied in part.

Holden Engineering's motion is denied.

1

Before turning to the parties' arguments on the merits, a fundamental problem must be addressed.  Rhodes has not sued either the Plan or the Plan Administrator.  In a case involving ERISA benefits, the proper party defendant is the "party that controls administration of the plan."  Terry v. Bayer Corp., 145 F.3d 28, 36 (1st Cir. 1998).  See also Barkin v. Patient Advocates, LLC, 493 F. Supp. 2d 119, 122 (D. Me. 2007).  Here, because the Plan is entirely funded by Holden Engineering, Inc., those entities share an identity of financial interests: Plan liability to pay benefits will be borne directly by Holden. Perhaps that explains why Holden has not addressed Rhodes' failure to name the Plan or the Plan Administrator as parties, or sought dismissal on that basis.[1]

Given that circumstance, the court will presume that Rhodes intended to name the Plan and Plan Administrator as defendants. The court also presumes that Holden has no objection to deeming the Plan as well as Peter Holden, in his capacity as Plan

---

[1]    Rhodes' failure to name the Plan or the Plan Administrator may also be explained by language in the Plan itself.   In section 8.1 (entitled, "Enforcement"), the Plan provides that, "The Employer shall have the authority to enforce this Plan . . . [and] the Employer shall be the only necessary party" to any enforcement action.   Perhaps the parties interpret that section of the Plan to mean that only Holden Engineering need be named as a defendant when a Plan Participant sues to enforce his or her rights under the Plan.

Administrator, as named defendants in this litigation.  If

Holden (or the Plan or the Plan Administrator) does object, a

written objection may be filed, stating in detail the basis for

that objection, as provided below.  Otherwise, the complaint

will be deemed amended by agreement to name the Plan and Plan

Administrator as defendants.


## Standard of Review

The parties agree that Holden's deferred compensation plan,

frequently known as a "top hat" plan, is governed by the

provisions of the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. §§ 1001 et seq.  See also 29 U.S.C.

§ 1051(2).  When, as here, an ERISA-governed plan reserves to

the plan administrator the discretion to interpret the plan and

determine benefits eligibility, a benefits decision under the

plan will be upheld unless it was "arbitrary, capricious, or an

abuse of discretion."  O'Shea v. UPS Retirement Plan, 837 F.3d

67, 73 (1st Cir. 2016) (citation omitted).  Under that standard,

a reviewing court "asks whether a plan administrator's

determination is plausible in light of the record as a whole,

or, put another way, whether the decision is supported by

substantial evidence in the record."  Colby v. Union Sec. Ins.

Co., 705 F.3d 58, 61 (1st Cir. 2013) (citation and internal

quotation marks omitted).  See also Niebauer v. Crane & Co., 783

F.3d 914, 922–23 (1st Cir. 2015) (applying the court's "typical deferential standard of review" to an ERISA-governed "top hat" plan).  See generally McCarthy v. Commerce Group, Inc., 831 F. Supp. 2d 459, 480 (D. Mass. 2011) (noting that even if benefits eligibility decisions under a top hat plan are subject to de novo review, when the plan administrator is vested with discretion, the court need only determine whether it exercised that discretion reasonably and in good faith; hence, the court's review is deferential and "the debate over the standard of review is much ado about not much").


## Background

Rhodes worked at Holden Engineering from 1984 to 1995. During four of those years, he participated in Holden's "Incentive Compensation Plan" – an ERISA-governed, deferred compensation plan administered for the benefit of Holden's highly compensated employees.  See Complaint, Exhibit 1 (document no. 1-1), "Holden Engineering & Surveying, Inc. Incentive Compensation Plan" (the "Plan").  Rhodes claims that under the terms of the Plan, he was entitled to $15,000 in deferred compensation for each of those four years, to be distributed to him upon one of the Plan's four "Events of Distribution."  Under the Plan, one of those events of

distribution was triggered when Rhodes turned sixty-five, on
December 13, 2014.[2]


About a week after he turned 65, Rhodes wrote to Holden
asking that the Plan Administrator distribute $60,000 in
benefits to which he was entitled, along with any accrued
interest.  He also requested an accounting of his deferred
compensation account.  In response, Peter Holden, President of
Holden Engineering and administrator of the Plan, denied Plan
benefits.  But, the reasons articulated for that denial seemed
completely untethered to any benefits eligibility criteria
described in the Plan.  Peter Holden (presumably speaking as the
Plan Administrator) stated that the Incentive Compensation Plan
was intended to serve as a means by which to encourage employee
retention; it was not designed to be a "retirement plan."
Moreover, he added, Rhodes' rights under the plan "terminated"
when he left the company's employ.  Finally, Holden stated that
"[t]his is a position that I am more than willing to defend."
Letter dated May 15, 2015, from Peter Holden (document no. 1-6)

---

[2]    When Rhodes resigned from Holden in 1995, the Plan
Administrator, in the exercise of his discretion, elected not to
distribute Rhodes' deferred compensation at that time.  See Plan
at section 4.3 (defining one of the "Events of Distribution" as
follows: "In the Plan Administrator's discretion, the
termination of the Participant's employment with the
Employer.").

(the "Denial Letter").  The Plan Administrator plainly took the position that Rhodes was entitled to nothing under the Plan. This litigation ensued.

One can only assume that upon receiving notice of Rhodes' suit, Holden consulted with an attorney who quickly realized the factual and legal errors in the Plan Administrator's Denial Letter.  Indeed, in its Answer to the Complaint (document no. 8), Holden offered an entirely different interpretation of the Plan than described in the letter to Rhodes.  Holden now acknowledges that Rhodes' rights under the deferred compensation plan did not "terminate" when he left Holden's employ, and it concedes that Rhodes is entitled to benefit payments under the Plan.

The only significant point of contention remaining is whether Rhodes is entitled to the full $60,000 in deferred compensation as a lump sum, or whether the Plan Administrator may distribute at least a portion of that money to him in equal payments, on an annual basis.  Also at issue is Rhodes' assertion that he is entitled to interest earned on the $60,000 in benefits over roughly 30 years, as well as the parties' cross-motions for an award of reasonable attorney's fees.

## Discussion

A.   The Plan Provisions.

Holden established the Plan in 1988, but it was made retroactively effective as of August 1, 1986.  Generally speaking, the Plan provided that each year the Plan Administrator could designate an eligible employee as a "Participant" in the Plan for that year.  The Plan, at section 2.3.  The Plan Administrator would also set the amount of deferred compensation to which the participating employee was entitled.  In essence, the Plan allowed Holden to award annual bonuses to select employees, while offering those employees the option of either taking that bonus "immediately" at the end of the current year, or deferring it until a later date (when, presumably, the Participant would be in a lower federal tax bracket).  But, because the Plan was established in 1988, it provided that participants could not elect an immediate payout for the years 1986 and 1987.  Those years had already passed and one might infer that Holden did not want to allocate the cash necessary to make "retroactive" payouts of year-end bonuses for those earlier years.[3]

_____

[3]     Moving forward, however, the Plan required Holden to set aside a "separate fund or funds" each year in an amount necessary to meet its financial obligations under the Plan.  The Plan, at section 3.3.  See also Id. at section 3.1.  The Plan

Consequently, under the Plan's terms, deferred compensation payments for 1986 and 1987 could only be taken upon an "Event of Distribution" (though, critically, the Plan is silent as to whether those payments may be taken as a lump sum, or whether they must be taken in annual installments over some indeterminate period of time).  The relevant section of the Plan provides as follows:

> For any Plan Year with the <u>exception of the 1986 and 1987</u> Plan Years, any Participant may elect to receive as an <u>immediate cash payment</u> rather than as a deferred future benefit all or any part of the amount which may thereafter be allocated to him for such Plan Year; provided, however, that such election shall be made by the Participant by completing Part II of the Notice and delivering the same to the Plan Administrator prior to the commencement of such Plan Year.

Plan, at section 4.1 (emphasis supplied).  The "Notice" referenced in the Plan was provided to Rhodes in April of 1988. It, too, had an exception for certain Plan Years.  Specifically, it provided that:

> **1986, 1987, and 1988 Plan Years**.  You have been credited with $15,000 with respect to Deferred Incentive Compensation for each of the years 1986–1988, inclusive.  <u>You will not have any election</u> with regard to the <u>form of distribution</u> of this Deferred Incentive Compensation upon the occurrence of an Event of Distribution as regards any Deferred Incentive Compensation for each of these years.  <u>You will, however, have the elections</u> indicated in paragraph B

---

contemplated that those funds could be invested or held in a cash account, in the discretion of the Plan Administrator.

> below with respect to all <u>plan years beginning in 1989</u>
> or thereafter for which you were designated as a
> Participant.

Notice to Participants Under Holden Engineering Plan (document

no. 1-2) at 1 (emphasis supplied).  The Notice then provided

that for Plan Years 1989 and thereafter, the Participant could

make a one-time election to receive payment of his or her

deferred compensation: (a) immediately, at the end of each year;

(b) in equal annual installments for a period not to exceed ten

years, commencing upon occurrence of an Event of Distribution;

or, finally, (c) as a "lump sum," upon occurrence of an Event of

Distribution.  Rhodes elected to receive his deferred

compensation for 1989 (and any following years in which he might

be a Participant) in the form of a lump sum.


In a separate section, the Plan establishes what might be

called a "default" payout mechanism.  It provides that if a

Participant fails to file a timely Notice regarding the method

of distribution he or she has elected <u>for the year 1989</u> (and

subsequent years), the Plan Administrator "shall elect for such

Participant the payout schedule . . . . as if the Participant

had elected the ten (10) year installment payout."  The Plan at

section 4.2.  But, as noted above, Rhodes did <u>not</u> fail to

complete and submit the Notice in which he elected the form of

payout he wished to receive.  Instead, as for the Plan year 1989
(and all subsequent years), he elected to receive a lump sum
upon one of the Events of Distribution.  Consequently, that
"default" payout option over a period of 10 years does not apply
to Rhodes.  It bears repeating that the Plan does not specify
how the Administrator would make payouts of deferred
compensation for the years 1986, 1987, and 1988 – the years at
issue in this case.

B.    The Plan Administrator's Decisions.

        The Plan Administrator's initial refusal to acknowledge
Rhodes' rights under the Plan, as well as his litigation-
inspired reinterpretation of the Plan, fall squarely within the
realm of "arbitrary and capricious" decisions.  His assertion
that "when an employee left the employ of the company their
rights in this retention plan terminated," Denial Letter at 1,
was wholly without legal merit and entirely inconsistent with
the Plan's terms.  While the Plan Administrator's recent
concession that Rhodes is entitled to $15,000 immediately (for
the 1989 Plan year) is consistent with Plan provisions and
Rhodes' elections, his assertion that Rhodes is entitled to the
balance of his deferred compensation in "ten annual installments
of $4500 beginning one year from the date of this [court's]

10

Order," Defendant's Memorandum at 19, is entirely without
support in the Plan.

According to Holden, the Plan is not obligated to begin
paying Rhodes deferred compensation for the years 1986-88 until
one year from now, notwithstanding that the "Event of
Distribution" triggering the Plan's payment obligations occurred
nearly two years ago.  That interpretation of the Plan language
is unarguably arbitrary and unreasonable.  It is neither
"plausible in light of the record as a whole," nor does it find
"substantial evidence in the record."  Colby, 705 F.3d at 61.

As noted earlier, the Plan fails to address how
distributions are to be made to Participants for the years 1986,
1987, and 1988 (other than stating that for two years - 1986 and
1987 - "immediate" payout is unavailable, and noting that for
three years - 1986, 1987, and 1988 - Participants cannot elect
their preferred method of payout).  The Plan Administrator's
notion that the Plan may defer payments to Rhodes over a ten-
year period is drawn from entirely unrelated language in the
Plan (which, as discussed below, may or may not be a defensible
exercise of discretion).  But, his assertion that the Plan need
not begin making those annual payments until one year after this

11

court resolves the pending motions lacks any support in the Plan
and is, in a word, arbitrary.

Even if, in the absence of specific Plan language, the Plan
Administrator retained the discretion to make equal annual
distributions to Rhodes over ten years - essentially borrowing
the "default" payout scheme from another section of the Plan -
those payouts would not be timed to this court's resolution of
the parties' dispute.  Instead, the first installment would have
become due upon Rhodes having turned 65 - the "Event of
Distribution" of which Rhodes made the Plan Administrator aware
nearly two years ago.  So, even if the court were to endorse (as
a permissible exercise of discretion) the Plan Administrator's
proposed ten-year payout scheme, Rhodes would (as of December
13, 2016) be entitled to the immediate payment of $28,500 (the
$15,000 lump sum all agree he is due, plus $13,500 representing
three payments of $4,500 to which Rhodes was entitled in
December of 2014, 2015, and 2016).  And, each year thereafter,
beginning on December 13, 2017, Rhodes would be entitled to an
additional $4,500.  See, The Plan, at section 4.3 ("The Plan
Administrator shall commence distributions to any Participant
. . . upon the earliest to occur of the following Events of
Distribution.") (emphasis supplied).  Nowhere in the Plan is
there any suggestion that the Plan Administrator may delay

making benefit payments for two or three years after the Event
of Distribution.  And, there is certainly nothing that would
authorize the Plan Administrator to delay making such payments
until one year after ordered to do so by a court of competent
jurisdiction.


C.   Interest.

     The next question presented is whether Rhodes is entitled
to interest on his deferred compensation from the date on which
it vested through the present.  The Plan is decidedly vague on
that point.  Section 3.2 provides that "Funds set aside or
earmarked to meet the Employer's obligations hereunder may be
kept in cash, or invested and reinvested, in the discretion of
the Plan Administrator."  It then goes on to provide that if
those funds are invested in stocks, bonds, or other securities,
the Plan Administrator will allocate among the various
Participants' accounts the costs associated with maintaining
those investments, as well as any investment gains or losses, on
a pro rata basis.  It does not, however, speak to "interest"
that might be earned if the funds were kept in "cash" (say, in
the form of a bank account).[4]

_____

[4]    Of course, the Plan's silence on that point may be easily
explained: funds deposited into an interest bearing account
would not have any "losses" or administrative fees that would
have to be allocated across various Participants' accounts; only

Elsewhere in the Plan, however, reference is made to "interest" earned on those retained funds.  Section 5.1 of the Plan provides that the "Employer shall maintain accurate and detailed records of each Participant's Bookkeeping Account." That section of the Plan goes on to require the Employer to provide "to each Participant, within ninety (90) days following close of each Plan Year, a written account" which shall include "the amount of [deferred incentive compensation] and interest credited to such Bookkeeping Account" as of the last day of the Plan year.  Id. (emphasis supplied).[5]

The record does not reveal how those "separate funds" were held, other than counsel's representation that the Plan Administrator "elected not to invest funds credited to Plaintiff."  Defendant's memorandum at 7-8.  See also Defendant's Statement of Disputed Facts (document no. 14), at

_____

interest, at a uniform rate, would have to be credited to those accounts.

[5]     Holden erroneously suggests that, because the deferred compensation funds owed to each Participant were not held in an investment account, the Plan Administrator was not required to maintain "Bookkeeping Accounts" for each Participant, nor was he required to provide Participants with an annual accounting.  See Defendant's Statement of Facts (document no. 14) at para. 9. That claim is entirely inconsistent with the Plan language.  See The Plan, at section 5.1.  See also Id. at sections 1.1.2, 2.3, 4.2.1, and 4.4.

para. 3.  But, if those funds were deposited into an interest bearing account of some sort, Plan Participants would likely be entitled to any interest earned, net of any related expenses. At a minimum, the Plan Administrator is obliged to disclose to Rhodes precisely how he held those funds (presumably, it was done in compliance with the requirements of the Plan), and he must provide Rhodes with the (required) accounting he requested. See The Plan, at section 5.1.


D.    The Appropriate Remedy.

Under ERISA, if a court concludes that a plan administrator has acted arbitrarily and/or capriciously in denying a claim for benefits, it has the discretion to either award those benefits immediately or to remand the matter to the plan administrator for "a renewed evaluation of the claimant's case."  Cook v. Liberty Life Assur. Co., 320 F.3d 11, 24 (1st Cir. 2003).  The unique facts presented in each case will typically dictate which resolution is more prudent.  See generally Quinn v. Blue Cross & Blue Shield Ass'n, 161 F.3d 472, 477 (7th Cir. 1998) (collecting cases in which courts concluded that remand is appropriate when the factual record is undeveloped, the plan administrator misconstrued the terms of the plan, and/or when the proper interpretation of the plan is uncertain).

Here, given the circumstances presented, the court concludes that remand to the Plan Administrator for further factual development and evaluation is appropriate.  For example, it would be helpful to know how the Plan Administrator has historically interpreted the Plan and addressed requests like Rhodes' – that is, how he has distributed deferred compensation to other Plan Participants for the years 1986, 1987, and 1988. Moreover, because the Plan Administrator denied Rhodes' claim for benefits, Rhodes never had the opportunity to persuade the Plan Administrator to exercise his discretion regarding the timing of payments in a particular manner.  Additionally, Rhodes needs to know how the Plan Administrator held those funds and, if they were held as cash, whether they were segregated into an interest-bearing account.

As noted earlier, the Plan is silent as to how the Plan Administrator should (or may) distribute Rhodes' deferred compensation for the years 1986, 1987, and 1988, but, in a different context – when a Participant has failed to notify it of his or her payout preferences for the years 1989 and forward – the Plan adopts a ten-year annual payment scheme as a sort of "default option."  See Plan at section 4.2.  Consequently, it is possible that such a payout scheme would lie at the outer limits

of the Plan Administrator's discretion with respect to Rhodes'
claim for benefits for the years 1986, 1987, and 1988.[6]

But, of course, the Plan Administrator may have
consistently exercised his discretion differently in the past
under identical circumstances, and such information may be
relevant in determining the limits of his discretion in this
case.  For example, if in all prior cases the Plan Administrator
disbursed deferred compensation from 1986, 1987, and/or 1988 to
Participants in a lump sum, it might arguably amount to an abuse
of discretion should he elect to treat Rhodes differently,
depending on the reasons articulated to support the exercise of
his discretion in that manner.  All of this is, of course,
speculative and reflects that the record is undeveloped on these
important issues.[7]

---

[6]   Because the Plan is silent, limits must necessarily be
inferred.  The Plan Administrator could not, for example,
sustainably decide to pay Rhodes' benefits over, say, 100 years.

[7]   Parenthetically, the court notes that the fact that Peter
Holden acted as both the President of Holden Engineering and the
Plan Administrator, coupled with the fact that the Plan is
unfunded, present a structural conflict of interest.  See, e.g.,
McCarthy, 831 F. Supp. 2d at 485.  Yet, neither party has
addressed how (if at all) that might affect the Plan
Administrator's discretion or limit his ability to distribute
Rhodes' deferred compensation over a substantial period of time.

On this record, the outer limits of the Plan Administrator's permissible discretion in distributing to Rhodes his deferred compensation for the years 1986, 1987, and 1988 simply cannot be determined. Nor is it apparent how the Plan Administrator held those funds over the intervening years, and whether interest accrued on those funds. Consequently, the court concludes that remand to the Plan Administrator for further proceedings, including full disclosure of all relevant information to the beneficiary, is appropriate.

E.    <u>Attorney's Fees</u>.

Both parties have moved for an award of reasonable attorney's fees. Holden invokes a provision of the Plan that says it shall be entitled to such fees should it "substantially prevail" in any action in which a Participant challenges any provisions or operations of the Plan. The Plan, at section 8.4. Rhodes, on the other hand, invokes ERISA's fee-shifting provision, which states that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C.A. § 1132(g)(1). <u>See also</u> <u>Hardt v. Reliance Standard Life Ins. Co.</u>, 560 U.S. 242, 255 (2010) ("[A] fees claimant must show 'some degree of success on the merits' before a court may award attorney's fees under § 1132(g)(1). A claimant does not satisfy that requirement by achieving 'trivial

18

success on the merits' or a 'purely procedural victory,' but
does satisfy it if the court can fairly call the outcome of the
litigation some success on the merits without conducting a
lengthy inquiry into the question whether a particular party's
success was 'substantial' or occurred on a 'central issue.'")
(citations and internal punctuation omitted).


Holden's request for attorney's fees is denied.  The Plan
Administrator's denial of Rhodes' application for benefits under
the Plan was not only incorrect, it was plainly arbitrary and
capricious.  And, it forced Rhodes to hire legal counsel and
file this action in order to vindicate his clearly established
rights under the Plan.  Holden cannot be said to have
"substantially prevailed" in this action.  Rhodes, on the other
hand, has secured a reversal of the denial of his benefits
request, an immediate award of a portion of those benefits, and
remand to the Plan Administrator so he may fully and carefully
consider how he will distribute the remaining deferred
compensation to which Rhodes is entitled.  It is beyond doubt
that Rhodes' victory was substantially more than "trivial" or
"purely procedural."  Hardt, 560 U.S. at 255.

**Conclusion**

Rhodes was forced to bring this action when the Plan Administrator denied that he had any rights under the Plan, and expressed his intent to defend that decision.  The initial denial of Rhodes' application for deferred compensation benefits, as well as the Plan Administrator's latest (unsupported) interpretation of the Plan language, are arbitrary and capricious positions that Rhodes should not have had to challenge by seeking legal counsel and bringing suit.

In light of the foregoing, Holden Engineering's motion for judgment on the administrative record (deemed a motion by the Plan and Plan Administrator as well) (document no. 19) is denied.  Rhodes' motion (document no. 17) is granted in part, and denied in part, as follows.

This matter is hereby remanded to the Plan Administrator for further proceedings consistent with this order.  While a final interpretation of the Plan language must await those proceedings on remand, this much may be said with certainty: even if the outer limits of the Plan Administrator's discretion would permit him to distribute Rhodes' deferred compensation in 10 equal, annual payments, Rhodes is still entitled to the immediate payment of $28,500.  That sum breaks down as follows:

| $15,000.00 | 1989 Plan year deferred compensation, payable in a lump sum upon Rhodes' 65th birthday, December 13, 2014. |
| $4,500.00 | First of ten equal annual payments, also due on December 13, 2014. |
| $4,500.00 | Second of ten equal annual payments, due on December 13, 2015. |
| $4,500.00 | Third of ten equal annual payments, due on December 13, 2016. |

Accordingly, on or before December 14, 2016, the Plan Administrator of Holden Engineering & Surveying, Inc. Incentive Compensation Plan shall pay to Rhodes the sum of $28,500.00. Additionally, the Plan Administrator shall provide Rhodes with an accounting of his deferred compensation account and shall disclose to him the manner in which the Plan held those funds during the years between 1986 and the present.

Rhodes is also entitled to an award of costs and reasonable attorney's fees and he shall present his request for the same to the Plan.  If the parties cannot agree on a reasonable award of costs and attorney's fees prior to January 10, 2017, Rhodes shall submit a well-supported motion for such an award to the court.  The Plan may file an objection within 10 days thereafter.

The Clerk of Court shall amend the case caption to include as named defendants both "The Holden Engineering & Surveying, Inc. Incentive Compensation Plan" and "Peter Holden, as Plan Administrator."  If any party objects, it shall file a written objection on or before December 23, 2016.

The Clerk of Court shall enter judgment in accordance with this order and close the case (subject to reopening, upon motion of either counsel, if necessary).

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

December 5, 2016

cc:  Benjamin T. King, Esq.
     James E. Higgins, Esq.